FILED 01 JUL '11 15:34 USDC-ORE

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

RICHARD KUBIK and BARBARA KUBIK,                    10-6078-TC

                          Plaintiffs,

              v.                                    OPINION AND ORDER

UNITED STATES FEDERAL BUREAU OF
PRISONS,

                          Defendant.

COFFIN, Magistrate Judge:

        This is an action for declaratory and injunctive relief.  Plaintiffs Richard and Barbara Kubik's

(Kubiks) complaint arises under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 and the

Administrative Procedures Act (APA), 5 U.S.C. § 706.  The Kubiks assert that the United States

Bureau of Prisons (BOP) violated FOIA by failing to make a reasonable search for documents

responsive to the Kubiks' FOIA requests and by improperly applying FOIA Exemptions to justify

the BOP's withholding of relevant documents. The Kubiks further argue that the APA provides an

additional remedy for the BOP's alleged failure to follow its FOIA regulations. Before the court are

cross-motions for summary judgment filed by the Kubiks and defendant BOP. (#18, #20 and #23).

The parties have consented to magistrate jurisdiction.

**Legal Standards**

**I.    The Freedom of Information Act**

"Congress enacted FOIA to overhaul the public-disclosure section of the Administrative

Procedures Act." <u>Milner v. Dep't of Navy,</u> ___ U.S. ___, 131 S.Ct. 1259, 1262 (2011);<u>see also,</u> <u>Dep't</u>

<u>of Air Force v. Rose</u>, 425 U.S. 352, 361 (1976) (discussing Congress' creation of FOIA). Congress

recognized that no statute effectively provided for disclosure to the public by the "hundreds of

[governmental] departments, branches and agencies which are not clearly responsible to the people."

<u>SDC Dev. Corp. v. Mathews</u>, 542 F.2d 1116, 1119 (9th Cir. 1976). Congress believed that "the

public as a whole has a right to know what its Government is doing." <u>Id.</u> (quoting S.Rep. No. 813,

89th Con., 1st Sess. 5 (1965)). "[D]isclosure, not secrecy is the dominant objective of the act."

<u>Rose</u>, 425 U.S. at 361. An informed citizenry is "needed to check against corruption." <u>NLRB v.</u>

<u>Robbins Tire & Rubber Co.</u>, 437 U.S. 214, 242 (1978).

This March, the Supreme court again emphasized that FOIA strongly favors openness and

"broad disclosure" with narrowly construed exceptions. <u>Milner</u>, 131 S.Ct. at 1265-66; <u>see also,</u> <u>Lion</u>

<u>Raisins, Inc. v. U.S. Dep't of Agric.</u>, 354 F.3d 1072, 1079 (9th Cir. 2004) (noting the Supreme

Court's broad interpretation of FOIA requires full agency disclosure except where specifically

exempted). FOIA has nine statutory Exemptions. 5 U.S.C. § 552(b)(1)-(9). However, even when

material falls within one of FOIA's nine Exemptions, an agency must disclose "any reasonably

segregable portion of a record...after deletion of the portions which are exempt." 5 U.S.C. § 552(b).

///

Page 2 - OPINION AND ORDER

## II.    Summary Judgment

A court will grant a summary judgment motion if the pleadings, the discovery, and disclosure materials on file, and any affidavits and declarations show that no genuine issue as to any material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). FOIA cases are typically decided on motions for summary judgment. Defenders of Wildlife v. U.S. Border Patrol, 623 F.Supp.2d 83, 87 (D.D.C.2009); Bigwood v. U.S. Agency for Int'l Dev., 484 F.Supp.2d 68, 73 (D.D.C.2007). Because FOIA cases rarely involve issues of disputed fact, the court need not utilize the typical summary judgment standard. Minier v. Central Intelligence Agency, 88 F.3d 796, 800 (9th Cir. 1996). Instead, the court conducts a two-step inquiry.

First, the court weighs whether the agency has established that it fully discharged its obligations under FOIA. Zemansky v. EPA, 767 F.2d 569, 571 (9th Cir. 1985). An agency can establish this by showing that it conducted a search reasonably calculated to uncover all relevant documents. Id.; Weisberg v. U.S. Dep't of Justice, 705 F.2d 1344, 1350-51 (D.C. Cir. 1983). If the agency has met this burden, the court next considers whether the agency has shown that any information not disclosed falls within one of the nine FOIA Exemptions. 5 U.S.C. § 552(a)(4)(B); U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991) ("The burden remains with the agency when it seeks to justify the redaction of identifying information in a particular document as well as when it seems to withhold an entire document."); Dobronski v. FCC, 17 F.3d 275, 277 (9th Cir. 1994). Thus, to prevail on a summary judgment motion in a FOIA proceeding, where the underlying facts and possible inferences are construed in favor of a FOIA requester, an agency must prove that it has adequately searched for documents and that any withheld documents information fall within an Exemption.

Page 3 - OPINION AND ORDER

## Background

The Kubiks' son Brian Kubik was an inmate in the federal prison system. He was incarcerated at the Federal Correctional Institute Phoenix (FCI Phoenix) and then transferred to the U.S. Penitentiary in Florence, Colorado (USP Florence). On April 20, 2008, Kubik was shot and killed by a prison guard during a disturbance at USP Florence that involved about 200 inmates and lasted almost half an hour. The BOP describes the disturbance as a race riot, started when white inmates walked across the prison soccer field in an aggressive manner yelling racial slurs. The prison's attempts to control the inmates failed, and white and African-American inmates began physically assaulting each other, striking each other with fists, kicks, baseball bats, and stabbing each other with homemade knives. The prison attempted to disburse the group by firing less than lethal munitions and gas rounds. When the riot continued, the prison fired lethal munitions. Finally, prison staff was able to separate the groups and regain control of the situation. During the fighting, however, the Kubiks' son Brian and another inmate were shot by prison guards and dozens of other inmates were injured. Five inmates were prosecuted in connection with their involvement in the April 2008 riot. There was discovery produced in the criminal cases–some documents were released under a protective order and some were released without redactions and not subject to a protective order. All the inmates charged eventually pled guilty; thus, no evidence regarding the riot was introduced at trial.

The Kubiks wanted to understand the details of the loss of their son: how and why he was killed; whether the guard who shot him was disciplined; whether he was wrongfully killed; and whether he was provided adequate medical treatment. They also wanted information regarding why he was transferred to USP Florence, which the Kubiks understand to be one of the most violent

Page 4 - OPINION AND ORDER

federal prisons in the United States. After several failed attempts to get information from USP Florence, the Kubiks' counsel sent a FOIA request to the prison on October 20, 2007. The request sought all records relating to or referencing Brian Kubik's transfer from FCI Phoenix to USP Florence (which the Kubiks refer to as the "first request) and records or files relating to events leading up to, including and following Brian Kubik's shooting at USP Florence on April 20, 2008 (referred to as the "second request"). The BOP's North Central Regional Office received and acknowledged the FOIA request on October 27, 2008. The regional office handling the request informed the Kubiks that "because of the location of any responsive documents, the amount of time necessary to respond to [their] request would increase." (#20 at 7[1]).

"[D]ue to the extensive nature of the April 20, 2008 disturbance" and the criminal investigation which stemmed from it, steps had already been taken to create a centralized point of contact for all documents, videos and other records related to the disturbance. (Id. at 7-8; #21 at ¶ 7). The Special Investigative Services office at USP Florence, and in particular the Special Investigative Agent (Investigative Agent or Agent) became the point of contact for these materials. (#21 at ¶ 7). The records were made available on an "as needed basis to Bureau [sic] and other Department of Justice components for the subsequent criminal investigations." (Id.) The regional office which acknowledged the Kubiks' FOIA request, delegated the request to the local field office for processing. When the request was delegated, the field office contacted the USP Florence Investigative Agent and the Agent provided all responsive documents for review. (Id.).

---

[1]The page citations refer to the CM/ECF pagination.

On March 12, 2009, a little over four months (136 days[2]) after the BOP received the Kubiks'

FOIA request, the BOP produced one heavily redacted ten page document in response to the Kubiks'

first request which sought information about Brian Kubik's transfer from FCI Phoenix to USP

Florence. The BOP claimed this ten page document was the only one the BOP could release and that

the redactions comported with FOIA's Exemptions. The BOP did not produce any documents

responsive to the Kubiks's second request which sought information about their son's shooting,

claiming that these documents could not be released "at this time" due to an ongoing investigation.

The BOP advised the Kubiks they could resubmit their second request to the Director of the Bureau

"at a later date when the law enforcement investigation was completed." (#21 at ¶ 10).

The Kubiks filed an appeal to the Officer of Information Policy on May 8, 2009. The appeal

argued that the requested documents were not exempt from disclosure and challenged the validity

of each Exemption the BOP claimed. The Kubiks received no response to their appeal and filed this

action in March 2010. The BOP closed the Kubiks' appeal without any final determination on April

22, 2010 due to this action being filed. The parties agree that the Kubiks exhausted all their

administrative remedies.

On November 9, 2010, after this action was filed, the BOP provided the Kubiks with

redacted documents which were responsive to their second request for information (documents

relating to the death of their son) pursuant to a stipulated protective order due to potentially private

---

[2]The statute requires that access to materials be granted within twenty working days from
the date requested. 5 U.S.C. § 522(a)(6)(A)(ii). The BOP asserts that the materials were delayed
well past the statutory time limit due to a backlog as well as their attempts to find and centralize
all relevant documents.

and/or sensitive information. (#19 at 26; see, also, #26, 30). The BOP produced a <u>Vaughn</u> Index[3]

which listed six documents and a videotape as documents responsive to the Kubiks' FOIA request.

The index listed the number of pages of each document, a description of each document and asserted

FOIA Exemptions to justify the non-disclosure of documents or portions of documents. The Kubiks

contend that the BOP violated FOIA by not undertaking a reasonable search for records responsive

to their October 2008 FOIA request. They further argue that the responsive records produced–six

documents and a video, are not subject to any of the nine FOIA Exemptions and must be disclosed

without redactions. The Kubiks state that they are willing to view the any portions of the documents

found to not be protected from disclosure at the United States District Court. The Kubiks "have no

interested in duplicating or sharing" the information in withheld documents and "simply want

answers" regarding their son's death. (#25 at 13).

### Discussion

The Kubiks challenge both the sufficiency of the BOP's search for documents relevant to

their FOIA requests and the FOIA Exemptions applied to the six documents and one video the BOP

deemed responsive to the requests.

## I.    <u>Adequacy of Search</u>

Upon receipt of a FOIA request, an agency must search its records for responsive documents.

5 U.S.C. § 552(a)(3)(A). "An agency fulfills its obligations under FOIA if it can demonstrate beyond

material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"

---

[3]An agency may satisfy its burden of showing that the information withheld is exempt
from disclosure and that non-exempt materials are adequately segregated by providing a
"relatively detailed justification through the submission of an index of documents known as a
Vaughn Index...." <u>Ctr for Int'l Envtl. Law v. Office of the U.S. Trade Representative</u>, 237
F.Supp.2d 17, 22 (D.C.C. 2002).

Valancia-Lucena v. U.S. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal citations omitted). As noted above, the agency bears the burden of showing that its search was reasonably calculated to uncover all documents relevant to the Kubiks FIOA requests. Zemansky 767 F.2d at 571. To make this showing, an agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search. Perry v. Block, 684 F.2d 121, 126 (D.C. Cir. 1982). The agency's affidavits or declarations need not "set forth with meticulous documentation the details of an epic search for the requested records," Perry, 684 F.2d at 127, but they must describe "what records were searched, by whom, and through what processes," Steinberg v. Dep't of Justice, 23 F.3d 548, 552 (D.C. Cir. 1994), and must show that the search was "reasonably calculated to uncover all relevant documents." Wilderness Soc'y v. U.S. Dep't of the Interior, 344 F.Supp.2d 1, 20 (D.C.C.2004).

Affidavits or declarations that "do not denote which files were searched or by whom, do not reflect any systematic approach to document location , and do not provide information specific enough to enable [a plaintiff] to challenge the procedure utilized" are insufficient to support summary judgment in the agency's favor. Weisberg v. U.S. Dep't of Justice, 627 F.2d 365, 371 (D.C. Cir. 1980). On one hand, without contrary evidence, the affidavits or declarations submitted by an agency are sufficient to establish the agency's compliance with FOIA. Perry, 684 F.2d at 126. On the other hand, however, if "the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." Truitt v. Dep't of State, 897 F.2d 540, 542 (D.C. Cir. 1990).

Here, the Kubiks make conclusory assertions that BOP violated its FOIA obligations by failing to undertake a reasonable search for records responsive to their request. Specifically, in their

Page 8 - OPINION AND ORDER

memorandum in support of summary judgment, they allege "[f]or the same sound reasons stated above in Section III, The BOP has violated FOIA...by failing to undertake a reasonable search for responsive records to this request." (#19 at 33). A review of section III, however, does not reveal any argument supporting (or even a mention of) the Kubiks' assertion that BOP failed to undertake a reasonable search. To meet its burden of establishing that its search was reasonably calculated to uncover all relevant documents, the BOP has submitted a declaration by Christopher Synsvoll, the Supervisory Attorney at USP Florence. (#21). Synsvoll declares that, based on the scope of the records the Kubiks' requested, the BOP's regional office that acknowledged the request coordinated the search for responsive records with a BOP field office. As noted above, due to the criminal proceedings stemming from the April 2008 riot, the BOP had designated the Investigative Agent at USP Florence as the point of contact for all records and also centralized all records. (#20 at ¶ 7). When the regional office delegated the FOIA request to the BOP field office, the field office contacted the Investigative Agent who provided all responsive documents for review. (#21 at ¶ 7).

Although the Kubik's arguments regarding the sufficiency of the BOP's search is somewhat short on details, the BOP's statements fall far short of the legal requirements for establishing the adequacy of its records search. Christopher Synsvoll's declaration states only that the BOP's regional office coordinated a search for responsive records with a Bureau Field Office and that steps were taken to make sure to centralize all relevant Bureau records pertaining to the April 20, 2008 riot. (#21 at ¶7). These conclusory statements contain no detail and do not establish the scope or method of the search. Maynard v. CIA, 986 F.2d 547, 559 (1st Cir. 1993); Weisberg, 627 F.2d at 371 (D.C. Cir. 1980). The documents BOP eventually produced were responsive to the Kubiks' FOIA request. However, production of some responsive documents does not allow me to determine

Page 9 - OPINION AND ORDER

whether all responsive documents were found and produced. Because of the deficiency in Synsvoll's declaration, I am left with "a substantial doubt as to the sufficiency of the search." Truitt, 897 F.2d at 542. Defendant BOP has not shown that it conducted a records search "reasonably calculated to uncover all relevant documents." Weisberg, 745 F.2d at 1485. Accordingly, the Kubiks are entitled to judgment on this claim.

## II.    FOIA EXEMPTIONS

At issue here are Exemptions 2, 5, 6, and 7 (C), (E), and (F), which the BOP claims justify withholding portions of documents it produced in response to the Kubiks' FOIA requests.

### A.    Exemption 2

The BOP withheld portions of documents 1, 2, 4, 5, 6 and the video recording under Exemption 2–specifically, the BOP applied the "(b)(2) high" exemptions to the documents. (Decl. of Christopher Synsvoll (#21 at ¶16-22). Document 1 is a BOP memorandum written by a criminal investigator regarding an assault by inmate Kubik on another inmate at FCI Phoenix. (#18-13, doc. 1 at 2). Document two is an inmate monitoring document detailing other inmates from whom Brian Kubik was separated. (Id., doc. 2). Document 4 consists of a nine page BOP mortality review regarding Brian Kubik's death. (Id., doc. 4). Document 5 is Brian Kubik's 24 Hour Death Report and other BOP memoranda relating to the mortality report. (Id., doc. 5). Document 6 is a BOP Board of inquiry review and report concerning the April 20, 2008 riot and inmate deaths, and it analyzes the facts surrounding the riot, decisions made during the riot, and recommendations. The document was prepared at the request of the Office of General Counsel and at the direction of the BOP director in anticipation of litigation. (Id., doc. 6). Finally, document 7 is video footage of the April 20, 2008 riot, which contains footage of Brian Kubik's fatal injury. The BOP contends that release of the

Page 10 - OPINION AND ORDER

withheld portions of these documents could jeopardize BOP's security and operations and are therefore exempt from disclosure under the "High 2" exemption.

Exemption 2 shields documents "related solely to the internal personnel rules and practices of an agency" from compelled disclosure. 5 U.S.C. § 552(b)(2). Congress enacted Exemption 2 "to replace the APA's exemption for 'any matter relating solely to the internal management of an agency,' 5 U.S.C. § 1002 (1964 ed.)." Milner, 131 S.Ct. at 1262. Recently, the Supreme Court discussed judicial interpretations and analysis of the Exemption, including reviewing courts referring to materials concerning human resources and employee relations as "Low 2" exemptions and to materials whose disclosure would risk circumvention of the law as "High 2" exemptions. Id. at 1263. The Court stated that "consideration of Exemption 2's scope starts with its text"... and noted that "comparatively little attention has focused on the provision's 12 simple words: "'related solely to the internal personnel rules and practices of an agency.'" Id. at 1264. "The key word in that dozen–the one that most clearly marks the provision's boundaries–is 'personnel.'" Id. The Court concluded that Exemption 2 uses "personnel" "as a modifier meaning 'human resources.'" Id. at 1265. "An agency's 'personnel rules and practices' are its rules and practices dealing with employee relations or human resources." Id. The Court further observed that "all the rules and practices referenced in Exemption 2 share a critical feature: They concern the conditions of employment in federal agencies–such matters as hiring and firing, work rules and discipline, compensation and benefits." Id. In short, "[the Court's] construction of the statutory language simply makes clear that Low 2 is all of 2 (and that High 2 is not 2 at all...). Id.

Exemption 2, as construed by the Supreme Court in Milner, does not reach any of the information in the documents at issue here. See e.g., Milner, 131 S.Ct at 1267 (observing that "the

Page 11 - OPINION AND ORDER

only way to arrive at [the] High 2 [exemption] is by taking a red pen to the statute–'cutting out some' words and 'pasting in others' until little of the actual provision remains."). These documents relate solely to prison inmate issues: tracking and monitoring inmates; supervising problem inmates; reviewing and reporting inmate deaths; and responding to major incidents within prisons. By no stretch of the imagination do they relate to "personnel rules and practices" as that term is most naturally understood. Instead they concern inmate discipline issues, treatment of inmates and post-incident summaries of actions taken during a prison riot, not the workplace rules governing prison employees or the treatment of prison employees. Thus, the BOP may not use Exemption 2, as in recently interpreted by the Supreme Court in Milner, to prevent disclosure of the requested documents.[4]

### B.   Exemption 5

The BOP withheld portions of document 6 under Exemption 5. As noted above, document 6 is the Board of Inquiry Report, and the portions withheld pursuant to this Exemption consist of a "rough summarization of the Board of Inquiry committee's interviews of the staff members regarding the staff members' recollection of the day of the [riot] and their response to the [riot]" and the committee's assessment of staff and inmate atmosphere at USP Florence and the committee's finding and recommendations regarding corrective actions.    (#21 at ¶ 30). The BOP asserts that it applied Exemption 5 to protect attorney-work product and documents created through the deliberative process.

---

[4]The BOP's Vaughn index relies on Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051 (D.C. Cir. 1981) (en banc) to justify withholding documents under the "High 2" exemption. In Milner, however, the Supreme Court rejects Crooker's reasoning and abrogates its holding. Id. 131 S.Ct. at 1267-69.

Exemption 5 protects documents which "would not be available by law to a party...in litigation with the agency." 5 U.S.C. § 552(b)(5). This provision essentially grants an agency the same power to withhold documents as it would have in the civil discovery context. NLRB v. Sears, Roebuck, and Co., 421 U.S. 132, 149 (1975). To be withheld under attorney work-product, a document must have been prepared by an attorney or his or her agent in anticipation of litigation. Delaney, Migdail & Young, Chartered v. I.R.S., 826 F.2d 124, 126 (D.C. Cir. 1987). Attorney work-product protects documents prepared in anticipation of litigation, specifically memorandums, letters, and e-mails. Fed. R. Civ. P. 26(b)(3). The purpose of this protection is to "protect the attorney's thought processes and legal recommendations from the prying eyes of his or her opponent." In re EchoStar Communications Corp., 448 F.3d 1294, 1301 (C.A. Fed 2006); see also, Hickman v. Taylor, 329 U.S. 495 (1947).

Documents protected under the attorney work-product privilege are also often protected under the deliberative process privilege. To claim the deliberative process privilege, the agency must show that the document was predecisional–prepared before the agency made its decision, and deliberative, meaning that it must actually be "related to the process by which agency policies are formulated." Jordan v. United States Department of Justice, 591 F.2d 753, 744 (D.C. Cir. 1978) (overruled in part on other grounds). The Ninth Circuit has instructed that documents are not deliberative "unless they consist of advice, recommendations, or opinions on legal or policy matters which reveal the mental process of a decisionmaker." Assembly of the State of California v. United States Dep't of Commerce, 968 F.2d 916, 920 (9th Cir. 1992). There is a distinction between materials that are opinion or "recommendatory" and factual information; the privilege does not apply to the factual portion. EPA v. Mink, 410 U.S. 73, 89 (1973) (overruled on other grounds).

Page 13 - OPINION AND ORDER

As noted, the withheld portions of document 6 summarize interviews of staff members regarding their recollections and reactions to the April 20, 2008 riot and record the committee's findings regarding the staff and inmate atmosphere and the committee's recommendations for corrective action. The BOP argues that these portions are properly withheld because the document would not exist had the General Counsel not requested an investigation into the April 20, 2008 riot. I cannot agree with the BOP's expansive reading of Exception 5 with respect to the summarization of interviews with staff members. Although the General Counsel may have requested an investigation into the riot, the record indicates that the withheld portions of document 6 contain the Board of Inquiry committee's summary of the staff members recollections and responses to the riot–materials which cannot fall under the umbrella of an attorney's mental impressions, conclusions, opinions, or legal theories concerning litigation.[5] Indeed, this material is merely a summary of facts, to which the privilege does not apply. EPA, 410 U.S. at 89.

I find, however, that the committee's assessment of the staff and inmate atmosphere at the prison and the committee's findings and recommendations about corrective actions were properly withheld under Exemption 5. As noted above, for a document to fall within the deliberative process privilege, it must both be predecisional and deliberative in nature. The committee's assessment of the prison atmosphere and resulting findings and recommendations is exactly the process Exemption 5 seeks to protect for disclosure. Coastal States Gas Corp., 617 F.2d 854, 866 (1980) (noting that the deliberative process privilege is to protect agencies from having to make their decisions in a

_____

[5]The situation here is distinguishable from Hickman v. Taylor where the Supreme Court applied the privilege to protect witness statements as well as attorney notes taken during the interviews. Id. 329 U.S. 495, 511-13 (1947) Here, there is no assertion that a BOP attorney interviewed involved staff and summarized the staffs' recollections and responses.

fishbowl). In reviewing this portion of the document, it is apparent that this portion of the document was prepared before the committee made its final recommendation and that the assessment of the prison atmosphere reflects the committee's policy making process. Disclosure of these materials has the potential to chill frank discussions in the BOP's decision making process and to diminish the deliberative process. Accordingly, the portion of document 6 which relates to the committee's assessment of the prison atmosphere and the committee's findings and recommendations about corrective actions is properly withheld under Exemption 5.

### C.    Exemption 6 and Exemption 7(C)

Exemptions 6 and 7(C) both deal with invasion of privacy. The BOP redacted the names of BOP staff and inmates from documents 5 and 6 under Exemptions 6 and 7(C), and it redacted names and personal identifiers of BOP staff and inmates from documents 1, 2, 3 and the video recording under 7(C). Document 1 is a BOP memorandum summarizing an investigation into Brian Kubik's assaults on other inmates. Document 2 is a one page document regarding inmates from whom Brian Kubik was separated. Document 3 is a BOP transfer request for Brian Kubik. Document 5 consists of thirty-nine pages of reports and memoranda relating to Brian Kubik's death. Document 7–the video recording, includes footage of Kubik being shot.

Under Exemption 6, FOIA's disclosure requirements do not apply to "personal and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). With this Exemption Congress intended to "[balance]...the individual's right of privacy against" FOIA's purpose of "open[ing] agency action to the light of public scrutiny." Exemption 7(C) shields from public disclosure information about individuals where: (1) the "information [was] compiled for law enforcement purposes," and; (2) the disclosure

of the information could "reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Courts use the approximately the same public interest versus privacy interest that for both Exemption 7(C) and Exemption. Rose, 425 U.S. at 372. Exemption 6 has a higher threshold, allowing agencies to withhold documents that "would constitute" an invasion of privacy. Exemption 7(C)'s lower threshold protects any disclosure that "could reasonably be expected to constitute" an invasion of privacy. Nat'l Archives and Records Admin. v. Favish, 541 U.S. 147, 167 (2004). When both Exemptions apply, the government need only meet Exemption 7(C)'s lower threshold. Lahr v. Nat'l Transportation Bd. of Safety, 569 F.3d 964, 974 (9th Cir. 2009).

In his declaration, Supervisory Attorney Synsvol states that, under Exemption 6, the BOP redacted the names of Bureau line staff (staff who were attempting to contain the riot in the prison yard) from document 5 to protect the staff from retaliation. As noted above, document 5 is a collection of documents relating to the events surrounding Brian Kubik's death. It is not a personnel or medical file. Given that case law instructs me to narrowly construe FOIA's exceptions, I cannot find that Exemption 6 protects the name of line staff from disclosure. See generally, Rose, 425 U.S. at 360-61 (stating that FOIA's basic policy of full disclosure is exempted under "clearly delineated statutory language."). Moreover, this is not a case where disclosure of the names of line staff would reveal little or nothing about an agency's conduct. Instead, disclosure of this information would shed light on the conduct of both the BOP and its employees acting in their official capacities.

Synsvoll declares that the information withheld under Exemption 6 included: personal information about BOP staff involved in the Board of Inquiry, detailed information on inmates involved in the April 20, 2008 disturbance, information regarding individual inmates' medical

Page 16 - OPINION AND ORDER

conditions and/or treatment and other clearly personal information of BOP staff and inmates. Again, I note that Exemption 6 applies to personnel and medical files and similar files. Reports on prison riots and shooting incidents are not personnel and medical files and cannot be withheld as a "similar file" under Exemption 6. Such information is less intimate that than normally found in personnel or medical files. Similarly, I cannot find that Exemption 6 encompasses the names of BOP staff involved in the Board of Inquiry or information. Castaneda v. United States, 757 F.2d 1010, 1012 (9th Cir. 1985) (noting that because a USDA investigator's name was likely discoverable in any civil case brought against the Agency, it was hard to see how disclosure of his name in a FOIA request would seriously infringe on his privacy). As another District Court in this Circuit has noted "revealing the names of government employees who are making important government policy serves FOIA's core purpose of contributing to the public's understanding of how its government operates. Knowing who is making government policy is relevant to understanding how the government operates." Gordon v. FBI, 388 F.Supp.2d 1028, 1040 (N.D.Cal.2005) (emphasis in original). Although the supporting declaration asserts that some of the information withheld under Exemption 6 is "clearly personal," there is nothing, beyond this conclusory statement that supports a finding that release of the information could reasonably be expected to constitute an invasion of privacy. Thus, I find that the BOP properly withheld information regarding the names and medical conditions and/or treatment of prisoners involved in the riot. None of the other redacted information is protected under Exemption 6.

The BOP utilized Exemption 7(C) to protect the names and identities (and personal identifiers) of inmates and staff. According to the BOP, release of this information could: subject the individuals named to retaliation, threats, harassment or other actions from Brian Kubik's friends;

harm the safety of BOP staff and other inmates; subject these individuals to unanticipated and

unwanted injury to their reputation; and subject them to an unwarranted invasion of privacy.  As

noted above, the threshold inquiry is whether documents 1, 2, 3, 5, 6, and 7 (the video) were

complied for law enforcement purposes.  BOP argues that they were because they were "compiled

as part of the BOP's statutory mandate of protecting inmates."  (#20 at 21-23).  However, not all

documents compiled by a law enforcement agency such as the BOP are compiled for law

enforcement purposes.  Whether documents are compiled for such is determined by a two part test:

(1) the agency's investigative activities that gave rise to the documents must be related to the

enforcement of federal laws; and (2) the nexus between the investigation and one of the agency's law

enforcement duties must be based on sufficient information to support at least a colorable claim of

its rationality.  Pratt v. Webster, 673 F.2d 408, 413 (D.C. Cir. 1982).[6]  The second prong is

deferential to the particular issues facing a law enforcement agency, and a court, therefore, should

be hesitant to second-guess a law enforcement agency's decision to investigate if there is a plausible

basis for its decision.  Id. at 420-21.

          After careful review of the record and the documents submitted for in camera review, I find

that the BOP has met its burden is proving that document 1 was compiled for law enforcement

purposes.  The Vaughn Index notes that this document was compiled by a criminal investigator

during the criminal investigation of Brian Kubik's assault on other inmates.  (#18-13, ex 1).  The

BOP has not met its burden with regard to documents 3, 5, 6 and 7.  The BOP's suggestion that its

status as a law enforcement agency responsible for the welfare of inmates in its custody, its staff and

---

          [6]Although the Pratt decision preceded the 1986 FOIA amendments, it remains the
controlling precedent on the compiled-for-law-enforcement-purposes requirement.  Keys v.
United States Dep't of Justice, 830 F.2d 337, 340 (D.C. Cir. 1987).

the general public sufficiently establishes that a list of inmates from whom Kubik was separated (document 2); Kubik's transfer document (document 3), a thirty nine page document related to a Kubik's mortality review (document 5), a BOP inquiry regarding the riot and inmate deaths (document 6) and a surveillance video (document 7) is not well taken. Other courts have rejected a per se rule of this sort. See Pratt, 673 F.2d at 416; see also, Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 926 (D.C.Cir.2003) (stating that, notwithstanding DOJ's law enforcement specialty, "[t]o establish a law enforcement purpose, DOJ's declarations must establish (1) a rational nexus between the investigation and one of the agency's law enforcement duties; and (2) a connection between an individual or incident and a possible security risk or violation of federal law") (citation and quotation marks omitted); King v. Dep't of Justice, 830 F.2d 210, 229 (D.C.Cir.1987) (explaining that an FBI record did not automatically satisfy this threshold requirement "simply by virtue of the function the FBI serves"). Although the BOP's supporting declaration identifies particular incidents–Kubik's transfer, his behavioral issues and the riot respectively, it does not connect these incidents or any individual involved to a potential violation of law. Instead, it appears that these documents are largely related to administrative functions–documenting management of a particular inmate and reviewing an incident for the purpose of considering modifying BOP policies to avoid future riots. On this record, I cannot grant summary judgment in favor of BOP regarding the application of 7(C) to documents 2, 3, 5, 6, and 7. Banks v. Dep't of Justice, 700 F.Supp.2d 9, 18 (D.C.C. 2010) (denying summary judgment where the BOP "appear[ed] to rely solely on its status as a law enforcement agency as the premise from which the Courts should conclude that any record it maintains was compiled for law enforcement purposes").

Further, even assuming arguendo that the documents were compiled for law enforcement

purposes, I cannot find that the privacy interests outweigh the public interest. The public has a strong interest in government investigations, especially an investigation like the one at issue here where a prison inmate was shot by a prison employee. Castaneda, 757 F.2d at 1012. Moreover, with respect to a mortality review and video images of Brian Kubik's death, the countervailing private interest is that of "the family [of the deceased]." Favish, 541 U.S. at 173. The privacy interests of public officials, like prison guards or officials are somewhat reduced. Lissner v. U.S. Customs Service, 241 F.3d 1220, 1223 (9th Cir. 2001). And, as previously noted, information, such as the names of the involved guards and officials are likely to be discoverable in civil litigation, so "it is hard to see how the disclosure of [these names] in these proceedings would seriously infringe on [the BOP staffs'] privacy." Castaneda, 757 F.2d at 1012. In fact, several pages of document 5, were released to criminal defense attorneys in the prosecution of five of the inmates involved in the riot without any redactions and not subject to any protective order. Accordingly, even if the documents were compiled pursuant to a law enforcement purpose, I cannot find that privacy interests outweigh the public's interest in disclosure.

### D.    Exemption 7E

Pursuant to Exemption 7(E), the BOP withheld document 7 (the video) and portions of document 6. Exemption 7(E) allows agencies to withhold information compiled for law enforcement purposes when release would disclose techniques and procedures for law enforcement investigations or prosecutions or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. 5 U.S.C. § 552(b)(7)(E). This Exemption is subject to a two prong test similar to the test for 7(C) described above: the agency must establish that the records were compiled for a law enforcement purpose and

establish that the records reveal law enforcement techniques or guidelines that, if disclosed, could reasonably be expected to risk circumvention of the law. Gordon, 388 F.Supp.2d at 1035. Withholding under Exemption 7(E) is justified even when the identity of techniques has been disclosed if the manner and circumstances of the techniques are not generally known or the disclosure of additional details could reduce their effectiveness. Council on American-Islamic Relations, California v. FBI, 2010 WL 4024806 (S.D. Cal. Oct. 12, 2010).

As discussed above, the BOP has not established that it compiled documents 6 and 7 for a law enforcement purpose. Even if BOP had established a law enforcement purpose behind the compilation of the BOP review and report on the April 2008 riot and the prison surveillance tape which shows Kubik being shot, it cannot establish that release of the video or the withheld portions of document 6 could reasonably be expected to risk circumvention of the law. The withheld portions of document 6 are staff names and descriptions of the tactical operations which occurred during the riot. Document 7 is a surveillance video of the prison yard. I note the tactical maneuvers used during the riot as well as the events recorded on the video are no secret to the prison inmates. Indeed, any inmate who was out on the yard had an opportunity to personally view the BOP staffs' reaction.[7] The BOP's argument that release of the video to the Kubiks would risk circumvention of the law by allowing inmates to "identify the location and parameters of the camera(s)" which could

---

[7]I also observe that in their arguments in support of materials withheld under Exemption 7(F), the BOP states that "an expansive internal fencing system was placed in the yard of USP Florence to provide better isolation and security....Allowing this information to be released would provide inmates of how BOP staff would likely respond to a similar disturbance in the future." (#20 at 28). It is hard to see how inmates could be unaware of an internal fence installed in the prison yard and be completely oblivious to the fact that it was installed after the April 2008 riot. Thus, reading about this installation in document 6–even if these documents were somehow available to the inmates, would not give inmates any advantage as they already know that a fence was installed.

Page 21 - OPINION AND ORDER

then allow inmates to engage in unlawful activities outside the camera's view is similarly unavailing. The BOP does not submit any evidence to support their contention that the utility of the surveillance cameras would be compromised if inmates knew the location of the cameras. Even assuming that the cameras are completely concealed and the inmates are unaware of their existence, the production of one videotape would reveal at most one camera's location in the exercise yard. Accordingly, I find that the BOP improperly applied Exemption 7(E) to documents 6 and 7.

The Kubiks, however, have stated through counsel that they do not object to the redaction of the location of weapons. My in camera review revealed that, within the redacted portions of the documents, an area was identified as a weapons storage area. Accordingly, the BOP may redact all information that identifies areas where weapons are stored.

### E.    Exemption 7(F)

The BOP invoked Exemption 7(E) to withhold the names of agency staff included in documents 5 and 6. The BOP asserts that disclosure of staff names would result in inmates retaliating against BOP staff. Exemption 7(E) protects the disclosure of the identity of any individual if such disclosure could reasonably be expected to endanger the individual's life or physical safety. 5 U.S.C. § 552(b)(7)(F). This Exemption can protect the names and identifying information of law enforcement agents as well as non-law enforcement federal employees and other third parties, like prison inmates. Blanton v. DOJ, 182 F.Supp.2d 81, 87 (D.C.C. 2002). Because an individual's safety generally outweighs public interest in agency transparency, a court addressing Exemption 7(F) need not engage in any balancing of interests. Raulerson v. Ashcroft, 271 F.Supp.2d 17, 29 (D.C.C. 2002). However, the agency's assertion that employees or third parties might be harmed must be "more palpable than mere possibilities." Rose, 425 U.S. at 380 n. 19; Gordon, 388

F.Supp.2d at 1040.

As noted above, all the inmates in the yard during the disturbance saw the BOP staff who responded and the guards' identities would be discoverable in any civil litigation. Thus, it is hard to see how releasing their names now could jeopardize their safety. Further, beyond a conclusory statement that releasing the names of the BOP employees and inmates would put them in harm's way, the Bureau does not offer any evidence to support its speculation. Accordingly, the BOP has not justified its application of Exemption 7(E) to documents 5 and 6.

### III.    APA Allegations

The Kubiks also allege a claim under the APA. Specifically, the Kubiks allege that under the APA, I may invalidate any BOP actions which were contrary to law, such as BOP's failure to follow its own FOIA regulation. I decline to consider the Kubiks' APA claim because FOIA itself provides them an adequate remedy. Thus, separate APA review is not available. 5 U.S.C. § 703 (APA review available except to the extent that prior, adequate and exclusive opportunity for judicial review is provided by law; 5 U.S.C. § 704 (APA review of actions "for which there is no other adequate remedy in court....").

Because FOIA provides the Kubiks with an adequate remedy, I grant summary judgment in favor of defendant BOP on their APA claim.

Conclusion

I deny the BOP's motion for summary judgment with respect to the Kubiks' inadequate search claim. This denial is without prejudice to the BOP renewing only this portion of its summary judgment motion after it either creates affidavits or declarations demonstrating that previous searches were reasonably calculated to uncover all relevant documents or conducts a new search. The BOP

Page 23 - OPINION AND ORDER

shall have 30 days from the date this order is filed to renew its motion for summary judgment with respect to the adequacy of its FOIA search. Response and reply briefing, if any, shall be in accordance with the local rules.

I find that the BOP properly utilized: (1) Exemption 5 to withhold the portions of document 6 which assess the Board of Inquiry Committee's assessment of the staff and inmate atmosphere at USP Florence and the committee's findings and recommendations about corrective actions; (2) Exemption 6 to withhold the names and medical conditions and/or treatment of prisoners involved in the riot from documents 5 and 6 and; Exemption 7(C) to withhold portions of document 1. I grant BOP's motion for summary judgment with respect to these above mentioned Exemptions and with respect to the Kubiks' APA claim.

I grant summary judgment in favor of the Kubiks with respect to the application of all other Exemptions to the relevant documents. As noted, the Kubiks have represented in briefing and at oral argument that they are willing to continue their non-disclosure agreement with the BOP and seek to view the documents at issue here, including the video, at the courthouse. I order that within 20 days of the date this order is filed, the BOP provide the Kubiks an opportunity to view the contested documents. The parties shall agree on a time during normal business days and hours and coordinate use of an area in the Courthouse during this time with the Clerk. Should the parties agree, it is permissible for the documents to be viewed at BOP's counsel's office. I grant the Kubiks' a fee waiver for any cost associated with the cost, production and delivery of the documents responsive to their request.

I deny the Kubiks' motion for attorney's fees and costs at this time without prejudice. The Kubiks may renew this motion following entry of final judgment in this case. Any renewed motion

Page 24 - OPINION AND ORDER

must be accompanied by supporting documents such as a bill of costs.

I cannot find that the BOP acted in bad faith in responding to the Kubiks' FOIA request. Thus, I deny the Kubiks' request that I refer this matter to the Merit System Protection Board.

IT IS SO ORDERED

DATED this ___/___ day of July 2011.

THOMAS M. COFFIN
United States Magistrate Judge